UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RYAN M CLANCY,

        Plaintiff,

    v.                                          Case No. 21-cv-0881-bhl

CITY OF MILWAUKEE et al,

        Defendants.

## ORDER DECIDING SUMMARY JUDGMENT

On May 31, 2020, Plaintiff Ryan Clancy, an elected Milwaukee County Supervisor and ACLU observer, was tackled and arrested by Milwaukee Police Officers while attending a protest in the wake of the police killing of George Floyd. Clancy responded to his arrest by filing this lawsuit in Milwaukee County Circuit Court, which Defendants then removed to this Court. (ECF No. 1.) In the now-operative Second Amended Complaint, Clancy asserts claims for unlawful seizure, excessive force, and failure to intervene against Milwaukee Police Officer David Bettin and Captain Christopher Moews, a failure-to-train claim against the City of Milwaukee, and claims for violations of his "freedom of movement" and Fifth and Fourteenth Amendment rights against the City and its former mayor, Tom Barrett. (*See* ECF No. 29.) Following a lengthy period of discovery, the parties have filed cross-motions for partial summary judgment. Defendants seek summary judgment on all but the Fifth and Fourteenth Amendment due process claims. (ECF No. 49.) Clancy seeks summary judgment in his favor on his claims against Bettin and Moews. (ECF No. 56.) Because Clancy does not oppose the dismissal of some of his claims,[1] those will be dismissed. As for the balance of the claims, Defendants' motion will be granted in part and denied in part, and Clancy's motion will be denied.

---

[1] Clancy agrees to the dismissal of his claims against Defendants Matthew Rosen and several unnamed John Doe police officers, his excessive force claim against Captain Moews, and his freedom of movement and *Monell* claims against the City of Milwaukee. (ECF No. 61 at 1.) The Court will also dismiss Clancy's "freedom of movement" claim against Mayor Tom Barrett in his official capacity because it is the equivalent of the claim against the City. *See Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987).

**FACTUAL BACKGROUND**

In the wake of George Floyd's murder in May 2020, the City of Milwaukee, like many cities across the country, experienced a number of large protests. (ECF No. 61-1 ¶1.) Mayor Tom Barrett responded by ordering a city-wide curfew. (ECF No. 59-1 ¶1.) The mayor's order declared a state of emergency and imposed a curfew beginning at 9 p.m. on May 31st and extending through 7 a.m. on June 1st. (*Id.*) The order exempted certain individuals from the curfew, including those providing government and emergency services, credentialed members of the press, utility service providers, and the providers of medical and social services. (*Id.*)

Just a month before the protests and curfew, on April 23, 2020, Plaintiff Ryan Clancy assumed office as Milwaukee County Supervisor for the Fourth District. (*Id.* ¶2.) In this role, Clancy provided constituent services, engaged in constituent outreach, and oversaw certain Milwaukee County departments. (*Id.* ¶3.) His outreach efforts included speaking with community residents to discuss what they would like to see from local government. (*Id.* ¶4.) The County provided him with an official business card, pin, ID card, and work cell phone. (*Id.* ¶5.) After his election, Clancy also served as a volunteer observer for the American Civil Liberties Union (ACLU). In that capacity, Clancy witnessed demonstrations and protests wearing a blue ACLU vest. (*Id.* ¶¶7–10.)

On May 31, 2020, Clancy parked in his work parking space in downtown Milwaukee and observed a police brutality protest wearing his ACLU vest. (*Id.* ¶¶11–12.) He was also wearing a jacket adorned with the logo of a business he owns, but he covered the logo to make clear he was not present in his capacity as a business owner. (*Id.* ¶¶19–20.) Clancy had his official business card, pin, ID card, work cell phone, and a second, personal, cell phone. (*Id.* ¶¶5–6.) Clancy contends he was, at the time, acting as both an ACLU observer and County Supervisor. (*Id.* ¶13.) In the latter role, he spoke with constituents about their "anxiety and concern and questions" regarding the protests. (*Id.* ¶14.) He also wanted to witness how the Milwaukee County Sheriff's Office treated residents. (*Id.* ¶16.)

The parties characterize the events that evening differently. The City paints a fraught picture of "chaos," with people "screaming and shouting." (ECF No. 61-1 ¶¶14–15.) Clancy maintains it was a largely peaceful demonstration. (*Id.*)

According to Clancy, once the curfew went into effect at 9 p.m., he was no longer attending as an ACLU observer. (ECF No. 59-1 ¶23.) He explains that the ACLU had instructed its

observers to obey the law fully, and because observers were not among those exempted from the curfew, he could no longer act in that role. (*Id.* ¶¶22–23.) But he remained at the protest, solely in his official capacity as a County Supervisor. (*Id.* ¶23.) Because his capacity had changed, he put on his jacket to cover up his ACLU vest and donned his supervisor pin. (*Id.* ¶24.)

As the night wore on, the protest moved from downtown Milwaukee to the east side, near the border of Milwaukee and the Village of Shorewood. (*Id.* ¶17.) Clancy arrived at the intersection of Oakland and Edgewood—still in Milwaukee—but was preparing to leave because "he felt there was no need for his continued presence." (*Id.* ¶25.) At this point, various law enforcement officers formed a line along the border of Milwaukee and Shorewood, keeping the protestors (and Clancy) on the Milwaukee side of the border. (*Id.* ¶26.) Clancy began filming the interactions between the protestors and the law enforcement officers on his phone, though the parties dispute whether he was using his work or personal phone. (*Id.* ¶27.) While filming, Clancy witnessed and recorded a law enforcement officer pull a female demonstrator roughly through the crowd. In response to the officer's actions, Clancy said "whoa whoa whoa whoa whoa," but did not make any physical movements. (*Id.* ¶¶28–30.)

Shortly after this exclamation, Clancy was arrested. One of the officers working the law enforcement line was David Bettin, a 20-year Milwaukee Police Department (MPD) veteran. (ECF No. 61-1 ¶3.) Bettin had been trained on the enforcement of city ordinances at the police academy. (*Id.* ¶4.) Clancy claims to have simply been filming the scene when Bettin abruptly tackled him from behind, without warning. (ECF No. 59-1 ¶¶31–32.) Defendants insist that Bettin merely grabbed Clancy's arm and ordered him to the ground. (ECF No. 61-1 ¶19.) The video evidence appears to corroborate Clancy's account. (ECF No. 58-1.) Once on the ground, Clancy complied with Bettin's instruction to put his hands behind his back. (ECF No. 59-1 ¶¶33–34.) Another officer then provided flexicuffs, which Bettin put on Clancy, who was "passed off" to the arrest team. (*Id.* ¶¶35–36.) Clancy reports that the flexicuffs hurt him and made his wrists numb. (*Id.* ¶¶37–38.)

Bettin's version of the arrest is muddled. He initially testified that he arrested Clancy after seeing him moving towards the line of law enforcement. (*Id.* ¶39.) But, after reviewing Clancy's video, Bettin admitted he did not see Clancy moving towards the police line. (*Id.* ¶40.) Clancy's video appears to show he was stationary when the officers pulled the female demonstrator through the crowd, moving only when Bettin tackled him. (*Id.* ¶41; ECF No. 58-1.) Defendants suggest

Bettin reasonably believed Clancy was attempting to interfere with the arrest of the female protestor. (ECF No. 61-1 ¶¶17–18.) Bettin states, however, that his only basis for arresting Clancy was for violating the curfew order. (ECF No. 59-1 ¶¶42–43.) Bettin admits he was aware of the curfew exemptions, including the exception for government officials, but only learned Clancy was a supervisor *after* he was in custody. (*Id.* ¶¶44–45.) Bettin acknowledges he did not investigate whether Clancy attended the protest in his official capacity. (*Id.* ¶46.) The parties dispute whether Clancy told Bettin that he was an ACLU observer. (ECF No. 61-1 ¶21.)

After arresting Clancy, law enforcement brought him to a police vehicle where he tried to clarify his role. (ECF No. 59-1 ¶51.) He first informed officers that he had a business card that would identify him as an elected official not subject to the curfew. (*Id.*) The officers began to search Clancy, and Clancy asked that they look in his right back pocket to see his business card. (*Id.* ¶52.) Clancy specifically identified himself as a "county supervisor." (*Id.* ¶53.) He denied police access to his cell phone, however, because he did not feel comfortable entering his cell phone's code to allow officers to access it. (ECF No. 61-1 ¶26.)

The law enforcement officers told the ranking officer at the scene, Christopher Moews, that an elected official had been arrested, and asked him to determine whether there was probable cause to arrest Clancy. (ECF No. 59-1 ¶¶54–56.) Clancy, now in a police vehicle, was asked to produce his business card for Moews, and Clancy complied. (*Id.* ¶¶57–58.) He also displayed his Milwaukee County pin, business cards, work ID, and his Milwaukee County cell phone, explaining he attended the protest for constituent outreach as a County Supervisor for District Four. (*Id.* ¶¶58–59, 64–65, 67.) Moews observed Clancy's (covered up) ACLU vest and the tape on his sweatshirt. (*Id.* ¶66.) Clancy continued to insist that his status as a public official meant he was exempt from the curfew and told Moews he would have to "unarrest [him] anyways" because of his status. (*Id.* ¶70.)

According to Defendants, Clancy initially claimed that he was falsely arrested in Shorewood. (ECF No. 61-1 ¶25.) Moews testified that Clancy was unprofessional, angry, uncooperative, and used profanity. (*Id.* ¶¶27, 33.) Specifically, Moews contends that Clancy refused to identify any articulable acts that would constitute official work like constituent outreach. (*Id.* ¶34.) He also asserts that members of the press and the ACLU were supposed to have signage indicating this affiliation. (*Id.* ¶32.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Id.* at 248; *Contreras v. City of Chicago*, 119 F.3d 1286, 1291–92 (7th Cir. 1997). A dispute over a material fact is "genuine" only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Anderson*, 477 U.S. at 248.

The moving party bears the burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To survive a properly supported summary judgment motion, the opposing party must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citation omitted). If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## ANALYSIS

The parties based their cross motions for summary judgment on their competing characterizations of the facts, without recognizing that their factual differences largely preclude entry of summary judgment on most of Clancy's claims.[2] For his part, Clancy argues, based on his version of events, that he is entitled to summary judgment on both the unlawful arrest and excessive force claims because Bettin and Moews failed to establish conclusively that he did not fit within one of the curfew exceptions. Defendants, on the other hand, contend that the facts leave no doubt that Bettin and Moews had probable cause to arrest Clancy and that Bettin did not use excessive force. Defendants also invoke qualified immunity. Because both side's versions of events are disputed, the cross motions will be denied on the excessive force, unlawful arrest, and

---

[2] Clancy insists that his version of the facts is bolstered by incontrovertible video evidence and therefore resolves any factual disputes in his favor. (ECF No. 56 at 7 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007).) The video exhibits are certainly helpful, but do not provide incontrovertible evidence in favor of either party.

failure to intervene claims, all of which must be resolved at trial. The Court will grant summary judgment, however, on Defendants' challenges to Clancy's *Monell* claim.

## I. Disputed Facts Preclude Summary Judgment on Clancy's Unlawful Arrest Claim.

Clancy's unlawful arrest claim rises or falls based on whether the defendants had probable cause to arrest him. "An essential predicate to any § 1983 claim for unlawful arrest is the absence of probable cause." *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998) (citing *Jones ex rel. Jones v. Webb*, 45 F.3d 178, 181 (7th Cir. 1995)). In fact, the existence of probable cause serves as an absolute bar to a claim for false arrest. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (citing *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 622 (7th Cir. 2010)). This is true even if the arrest is for a relatively trivial matter. *See Chortek v. City of Milwaukee*, 356 F.3d 740, 745 (7th Cir. 2004) (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)).

Probable cause must be analyzed based on what the officer saw and heard, and the facts known to him or her at the time of arrest. *See Tebbens v. Mushol*, 692 F.3d 807, 816 (7th Cir. 2012). The relevant inquiry is whether the "facts and circumstances within the officer's knowledge … are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). At the same time, an officer cannot close his eyes to information that cuts against probable cause. *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 718 (7th Cir. 2013) (citing *Fox v. Hayes*, 600 F.3d 819, 834 (7th Cir. 2010)). The Court must consider the totality of the circumstances known to the officers and not focus on a small part of the overall picture. *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). Given the context-driven nature of the inquiry, probable cause is found as a matter of law "only when the facts permit but one conclusion—that is, 'only when no reasonable jury could find that the officer did not have probable cause' to make an arrest." *Webb*, 45 F.3d at 182 (quoting *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993)).

Defendants contend that they are entitled to summary judgment because the undisputed facts show that Bettin and Moews had probable cause to arrest Clancy for two different offenses. (ECF No. 49 at 2.) Defendants' lead argument is that Bettin had probable cause to arrest Clancy for obstruction because Clancy shouted "whoa whoa whoa whoa whoa" in response to a woman's arrest and provided inconsistent statements to officers. (ECF No. 49 at 4–5; ECF No. 59 at 2–3.) There are several problems with this argument. First, as a factual matter, Bettin has admitted that

he arrested Clancy for violating the curfew order, not obstruction. (ECF No. 59-1 ¶¶42–43.) That Bettin did not contemplate an arrest for obstruction cuts against Defendants' claim that his actions were justified on that ground.[3] Second, this fact aside, the video evidence supports Clancy's argument that grounds did not exist for an obstruction arrest. In Wisconsin, "[w]hoever knowingly…obstructs an officer while such officer is doing any act in an official capacity and with lawful authority" is guilty of obstructing an officer. Wis. Stat. § 946.41(1). While the video shows that Clancy did in fact utter "whoa" several times, (ECF No. 58-1), those utterances are a long way from establishing probable cause for an obstruction arrest. Members of the public generally have a First Amendment right to question police conduct. *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1057 (7th Cir. 2004) (describing political protests as "some of the purest and most protected forms of speech and expression"). Exercising that right in a non-threating way, as the video evidence suggests here, is not a basis for an arrest. And, beyond Clancy's verbal response, the video does not show him taking any physical actions that might constitute obstructing any of the officers in their efforts to effectuate the woman's arrest. (ECF No. 58-1.) Defendants unhelpfully point to Bettin's statement that Clancy somehow "demonstrated an intent to interfere with the arrest of another protestor." (ECF No. 49 at 5.) This is nothing more than a conclusory assertion; it is not enough to carry the day at summary judgment. *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) ("[C]onclusory statements…are not enough to stave off summary judgment.") (citations omitted).

       Defendants fare better (but still fail) in trying to justify the arrest based on a violation of the curfew order. The record confirms that Clancy was out in the street at the time the curfew was in effect. If this were the entirety of the record, there would be no question that Defendants had probable cause to arrest him. But the record also includes Clancy's assertions that he attended the protest in his official capacity and his insistence that he informed Bettin and Moews of this fact repeatedly. (*See, e.g.*, ECF No. 59-1 ¶53.) Defendants dispute Clancy's version of events and argue they could not tell whether Clancy was acting in his official capacity at the time. (ECF No. 49 at 8.) They point to Bettin's testimony that Clancy gave inconsistent statements, including that

---

[3] Of course, Bettin's arrest of Clancy would be lawful if he had probable cause for a crime other than the one the officer had in mind. *See Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 682 (7th Cir. 2007) ("[P]robable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause[.]") (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).

he was acting as an ACLU observer, that he was acting as a government official, and that he was arrested in Shorewood (and therefore not subject to the curfew order at all). (*See id.* at 4.) On summary judgment, the Court must take the disputed facts in the light most favorable to the non-moving party. Clancy's testimony that he provided specific information to officers proving his exemption from the curfew as an elected official is enough, if believed, to defeat Defendants' claim that they were justified in arresting him for violating the curfew. Simply put, a reasonable jury could find that the officers had proof of Clancy's exempt status and arrested him anyway. Defendants' request for summary judgment on the false arrest claim must therefore be denied.

Clancy's argument for the affirmative entry of summary judgment in his favor is equally misplaced. The same factual disputes that defeat Defendants' arguments make Clancy's summary judgment effort a non-starter. A reasonable jury could accept the version of events provided by Moews and Bettin and reasonably find that Clancy attended the protest outside of his duties as a county supervisor and that he failed to provide the officers with proof of his official status. Those facts could support probable cause for Clancy's arrest. Because a reasonable jury could accept either side's version of events, neither side is entitled to summary judgment on the wrongful arrest claim. *Webb*, 45 F.3d at 182.

## II. Neither Party Is Entitled to Summary Judgment on the Excessive Force Claim.

Clancy's excessive force claim requires a determination of whether the force Bettin employed in arresting Clancy was objectively reasonable. *Howell v. Smith*, 853 F.3d 892, 898 (7th Cir. 2017). The reasonableness inquiry is evaluated based on "the totality of the circumstances" after "balancing ... the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citing *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003); *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009)). Among the relevant factors are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 861–62 (7th Cir. 2010) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Courts must also account for officers' need "to make split-second judgments based on rapidly developing events." *Stainback*, 569 F.3d at 772 (citing *Holmes v. Vill. of Hoffman Ests.*, 511 F.3d 673, 685 (7th Cir. 2007)). An officer's actions are evaluated from the perspective of a reasonable officer on the scene, and not with the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396. But the fact that a person has "at most,

committed a misdemeanor offense" and was "not exhibiting violent behavior" could indicate that an officer's use of force was excessive. *Cyrus*, 624 F.3d at 863.

Defendants argue they are entitled to summary judgment because the officers had probable cause to arrest Clancy and Bettin undisputedly used an objectively reasonable amount of force. (ECF No. 49 at 6.) Defendants characterize the force used against Clancy as "minimal," consisting of placing Clancy in handcuffs "during a chaotic and fluid situation." (*Id.*) As noted above, whether the officers had probable cause to arrest Clancy cannot be resolved on summary judgment. Similarly, the reasonableness of the force used is also a jury question. Clancy maintains that Officer Bettin tackled him from behind without providing any prior verbal warning or instruction. (ECF No. 59-1 ¶¶31–32.) The video evidence seems to confirm this; there is no indication that Clancy actively resisted or attempted to evade arrest before he was tackled. (ECF No. 58-1.) The video also does not show any verbal warning or instruction before Bettin brought Clancy to the ground. (*Id.*) The absence of this evidence raises questions about the reasonableness of the force used. In addition, Bettin's admission that he arrested Clancy on a mere curfew violation—a less serious offense than obstruction—limits the amount of force a reasonable officer could use to effectuate the arrest. *Graham*, 490 U.S. at 396 (citing "the severity of the crime at issue" is an important factor to consider in deciding excessive force cases).

The record contains evidence, however, that would appear to support Bettin's claim that he thought Clancy was attempting to infiltrate the line of law enforcement officers, an effort that might put his fellow officers at risk. (ECF No. 61-1 ¶¶16–17.) Bettin described his perception of the protest as chaotic, with hundreds of people "screaming and shouting." (*Id.* ¶¶14–15.) While Clancy's video does not paint the apocalyptic picture that Bettin describes, it does show a disordered and potentially dangerous situation. Law enforcement officers had their weapons drawn and were arresting people, amidst a crowd of several hundred people. (ECF No. 58-1.) Based on the totality of the evidence, depending on whose story is accepted, a reasonable jury could find for Clancy or Bettin. Neither party is entitled to summary judgment.

### III. A Reasonable Jury Could Find that Moews Improperly Failed to Intervene.

Clancy's claim that Moews failed to intervene to prevent Bettin from violating Clancy's rights must also await resolution of the parties' factual disputes. While the Constitution generally "creates only negative duties for state actors," a state actor's failure to intervene can also render him culpable under Section 1983. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). An officer,

once given a "badge of authority[,] . . . may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." *Id.* (quoting *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972)). An officer who fails to intervene is liable under Section 1983 if the "officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Conforti v. City of Franklin*, 559 F. Supp. 3d 815, 819 (E.D. Wis. 2021) (citing *Yang*, 37 F.3d at 285).

Defendants only summary judgment argument is that because Clancy cannot prove an underlying constitutional violation, there can be no failure to intervene. (ECF No. 49 at 10.) As a logical matter, Defendants' premise is correct; if there was no underlying violation, there cannot have been a failure to intervene. *Gill*, 850 F.3d at 342. But as explained above, it remains undetermined whether Clancy's underlying rights were violated. While Clancy has not finally *proven* an unlawful arrest or the use of excessive force, both claims remain viable. And a reasonable jury that found for Clancy on either claim could also find in Clancy's favor on the failure to intervene claim. Defendants' summary judgment challenge to Clancy's failure to intervene claim thus also fails.

### IV.   Moews and Bettin Are Not Entitled to Qualified Immunity.

Defendants also seek dismissal of Clancy's claims on qualified immunity grounds. At summary judgment, whether an officer is entitled to qualified immunity involves two questions: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at [that] time." *Taylor v. Ways*, 999 F.3d 478, 487 (7th Cir. 2021) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 550 (7th Cir. 2017)). "If the answer to either question is no, the defendant official is entitled to summary judgment." *Id.* (citing *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014)).

In answering the first question, the Court must construe any contested facts in Clancy's favor. *Sears*, 233 F.3d at 437; *Hoeppner v. Billeb*, 17-cv-430-bbc, 2018 WL 5282898, at *11 (W.D. Wis. Oct. 24, 2018) (citing *Board v. Farnham*, 394 F.3d 469, 476 (7th Cir. 2005)) ("[E]ven qualified immunity does not change the rule that facts must be construed in favor of the nonmoving party on a motion for summary judgment."). The second question requires an analysis of whether the right at issue was clearly established at the time of Clancy's arrest. While the established right

at issue has to be defined with specificity, an identical case on point is not required. *Strand v. Minchuk*, 910 F.3d 909, 915 (7th Cir. 2018) (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)). The law is clearly established if "the 'existing precedent [has] placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

### A. Factual Issues Preclude Finding Qualified Immunity on Clancy's Arrest.

Defendants argue that even if they did not have probable cause to arrest Clancy, qualified immunity protects them from liability because a reasonable officer would have believed he had probable cause to arrest Clancy. (ECF No. 59 at 4.) As Defendants note, in the unlawful arrest context, courts have recognized a qualified immunity defense even in the absence of *actual* probable cause, so long at the officer had *arguable* probable cause. *See Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012) ("An officer 'is entitled to qualified immunity in a false-arrest case when, if there is no probable cause, a reasonable officer could have mistakenly believed that probable cause existed.'") (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)). "A reasonable officer can have probable cause even if [he] turns out to be mistaken," because "[t]he Fourth Amendment 'demands reasonableness, not perfection.'" *Muhammad v. Pearson*, 900 F.3d 898, 909 (7th Cir. 2018) (quoting *Pasiewicz v. Lake Cnty. Forest Preserve Dist.*, 270 F.3d 520, 524 (7th Cir. 2001)).

Arguable probable cause exists when a reasonable police officer, considering well-established law, in the same circumstances, with the same knowledge, could have reasonably believed probable cause existed. *Humphrey*, 148 F.3d at 725 (citing *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997)). Like the existence of probable cause, whether an officer had arguable probable cause depends on the elements of the predicate offense. *Abbott*, 705 F.3d at 715 (citing *DeFillippo*, 443 U.S. at 36).

Defendants' qualified immunity defense thus depends on whether they had arguable probable cause to arrest Clancy. (ECF No. 49 at 3.) Their argument is not helped by Bettin's admission that his only basis for arresting Clancy was the curfew violation. (*See* ECF No. 61-1 ¶20.) As to this basis, it is undisputed that Clancy was in fact a County Supervisor who fell within one of the exceptions to the curfew order *if* he was acting in his official role. (ECF No. 59-1 ¶¶3, 44, 48.) If Clancy's version of the story is accepted, the officers would not have had even arguable probable cause to arrest him under the curfew order. While Defendants are correct that the chaotic

circumstances of the evening, coupled with Clancy's inconsistent answers, might have made it reasonable for them to question his credibility, those assertions are all premised on disputed versions of the events. (ECF No. 59 at 2–3.)  Clancy insists that he told Bettin and Moews unequivocally he was a County Supervisor and thus fell within an exception to the order, precluding any arguable basis for his arrest. (ECF No. 62 at 3.)  This is a factual issue that simply cannot be resolved on summary judgment.

Undaunted, Defendants insist that even if Clancy was exempted from the curfew order, they still had arguable probable cause for an arrest because findings necessary to apply the exemption go beyond the elements needed to make an arrest for violation of the curfew order. (ECF No. 49 at 8.)  They contend that so long as they had arguable probable cause for a violation of the curfew order, they were free to make an arrest without having to delve into any defenses Clancy might have been able to raise. (*Id.*)  This misunderstands the law.  Courts have confirmed that an officer who knows that a defendant's actions are excluded from a criminal or ordinance violation lacks probable cause to arrest, even if the exception is an affirmative defense. *See Moore v. City of Chi.*, No. 12 C 238, 2014 WL 1674194, at *5 (N.D. Ill. Apr. 28, 2014) (holding that because a reasonable jury could find that the plaintiff's actions were exempt from the statute at issue, and the officers knew that, officers lacked probable cause to arrest); *Robinson v. Cook Cnty.*, No. 20-cv-1253, 2021 WL 365770, at *3 (N.D. Ill. Feb. 3, 2021) (noting that if the plaintiff had qualified for the exemption to an offense, he could have shown that officers lacked probable cause).  If the officers were aware of exemptions to the curfew and had knowledge that Clancy fell within an exemption, they cannot claim qualified immunity after making an arrest in disregard of those facts. This conclusion flows from the basic premise that an officer cannot turn a blind eye to contrary evidence when making the probable cause determination. *Hodgkins*, 355 F.3d at 1061 (citing *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999)).

Looking at the facts in the light most favorable to Clancy as non-moving party, Moews and Bettin are not entitled to qualified immunity.  The officers were not required to take Clancy at his word, but the facts are sufficiently muddled to allow a jury to find that both officers should have reasonably determined that Clancy was exempt from the curfew order.  Indeed, a jury could find that Moews investigated Clancy's situation at the time of arrest and disregarded important pieces of information, precluding any good faith claim that he had arguable probable cause.

Defendant's qualified immunity gambit also fails on the second prong of the analysis. The right to be free from arrest without probable cause was clearly established at the time of Clancy's arrest in May 2020. *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 762 (7th Cir. 2008) ("An unlawful arrest occurs when a person is seized by police without probable cause.") (quoting *A.M. v. Butler*, 360 F.3d 787, 798 (7th Cir. 2004)); *Kelley*, 149 F.3d at 646 ("An essential predicate to any § 1983 claim for unlawful arrest is the absence of probable cause."); *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998) ("The constitutional right to be free from arrest without probable cause was, without question, 'clearly established' prior to … 1991.") (citing *Beck v. Ohio*, 279 U.S. 89, 91 (1964)). Accordingly, Defendants' qualified immunity defense fails with respect to the false arrest claim.

### B. Factual Issues Likewise Preclude Finding Qualified Immunity on the Officers' Use of Force.

Defendants also argue that Clancy cannot establish that the officers' conduct violated clearly established excessive force law. (ECF No. 49 at 9.) Because Clancy did not produce a case showing "his right to be free apparently from almost all physical force during his arrest under the circumstances then present," the argument goes, Defendants did not violate clearly established law by placing Clancy in handcuffs and applying "some level of force." (*Id.*) Defendants overstate Clancy's burden and minimize their own involvement.

As discussed in the preceding sections, when looking at the facts in the light most favorable to Clancy, a reasonable jury could find that Bettin and Moews used excessive force against him. Clancy was unarmed, not actively resisting or evading arrest, and only suspected of a misdemeanor curfew offense. *See Smith v. Finkley*, 10 F.4th 725, 736 (7th Cir. 2021) (citing *Graham*, 490 U.S. 386; *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015)). Clancy did not behave violently. A jury could certainly find Bettin's tackling of Clancy for a municipal curfew violation unreasonable. Defendants cannot obtain summary judgment by looking at just their own (disputed) version of events. (*See* ECF No. 61-1 ¶33.) While they claim Clancy was disruptive, he insists, with supporting evidence, otherwise. Given the totality of the circumstances, a jury could find that tackling Clancy was not necessary to effectuate a seizure.

Likewise, the requirement that officers may not using force greater than necessary to effectuate an arrest, even if lawful, was clearly established in May 2020. *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016) ("A police officer's use of force is unconstitutional if, judging from the totality of circumstances at the time of the arrest, the officer used greater force than was

reasonably necessary to make the arrest.") (quoting *Payne*, 337 F.3d at 778 (internal quotations omitted); *Graham*, 490 U.S. at 396 ("[P]roper application [of the Fourth Amendment reasonableness inquiry] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.") (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

## V. Clancy's *Monell* Claims Must be Dismissed Against Both the City and Mayor Barrett.

Defendants fare better with their challenge to Clancy's claim under *Monell* that the City and Mayor Barrett are liable for failing to adequately train law enforcement in enforcing the mayor's curfew order. (*See* ECF No. 29 ¶¶76–77; ECF No. 61 at 16.) Clancy particularly takes issue with the failure to train officers regarding the order's exceptions. (ECF No. 29 ¶77.) Defendants argue summary judgment is proper on this claim because Clancy has not established a constitutional injury or any facts that can sustain any training failure or unconstitutional policy. (ECF No. 49 at 13–15.)

In *Monell v. Department of Social Services*, the Supreme Court recognized that municipalities could be "persons" and thus held liable for constitutional violations under Section 1983. 436 U.S. 658, 690–91 (1978). *Monell* identified three circumstances in which a municipality could be legally responsible for a constitutional violation. First, a plaintiff could establish municipal liability by showing unconstitutional conduct that implements or executes an official policy adopted by the entity's officers. *Id.* at 690; *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc) (quoting *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35 (2010)). Second, the plaintiff can show that the unconstitutional action was done pursuant to a municipal custom—even one that is not formally codified. *Monell*, 436 U.S. at 690–91; *see also Glisson*, 849 F.3d at 379. Third, a plaintiff may prove that a municipal actor with final decision-making authority within the entity adopted the relevant policy or custom. *Monell*, 436 U.S. at 694.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of [Section] 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). But the failure "must amount to 'deliberate indifference to the rights of persons with whom the untrained employees come into contact.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "[A] city may be deemed deliberately indifferent if . . . policymakers choose to retain

[a training] program" "when [they] are on actual or constructive notice that a particular omission in [the] program causes city employees to violate citizens' constitutional rights[.]" *Id.* (citing *Bd. of Cnty. Comm'rs. v. Brown*, 520 U.S. 397, 407 (1997)). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (citing *Brown*, 520 U.S. at 409).

Unlike other theories of *Monell* liability, "failure-to-train liability does not require proof of widespread constitutional violations before that failure becomes actionable; a single violation can suffice where a violation occurs and the plaintiff asserts a recurring, obvious risk." *Flores v. City of South Bend*, 997 F.3d 725, 731 (7th Cir. 2021). In other words, municipalities do not receive "one-free-bite." *Id.* at 734. Even so, a municipality must still have had actual knowledge of a pattern of conduct with an "obvious need to provide training to avert harm." *See id.* at 733. And the need to provide training to prevent harm must be precise in addition to obvious. *See J.K.J. v. Polk Cnty.*, 960 F.3d 367 (7th Cir. 2020) (finding county liable for failing to train jail guards to prevent sexual abuse of female inmates); *Woodward v. Correctional Med. Servs. of Ill., Inc.*, 368 F.3d 917 (7th Cir. 2004) (holding county liable for failing to train employees on suicide prevention). But if one officer has a known pattern of reckless conduct, that may be enough to support a failure-to-train theory. *Flores*, 997 F.3d at 733 (noting the complaint asserted three prior occasions the officer acted recklessly and that the municipality knew that its officers routinely drove recklessly and took no action to prevent it).

Clancy's failure-to-train claim fails because he has not shown that the curfew enforcement was a "recurring, obvious risk." His theory is that the MPD had to enforce the mayor's proclamation by arresting violators without any training or guidance regarding the curfew. (ECF No. 61 at 16–17.) He insists that the curfew's "unclear language," "recurring protests," and the lack of training therefore "created an obvious potential for constitutional violations…result[ing] in Supervisor Clancy's unconstitutional arrest." (*Id.* at 17.) Neither of these assertions is enough to support a *Monell* claim.

Clancy offers no evidence that the City acted with deliberate indifference. *See Flores*, 997 F.3d at 731 ("[F]ailure to train liability is appropriate only when inadequate training 'amounts to deliberate indifference to the rights of persons with whom the employee come into contact.'") (quoting *Harris*, 489 U.S. at 388). Nor does he identify evidence that the City knew that officers were enforcing or would enforce the curfew order incorrectly. In fact, the officers testified that

they received training on curfews at the police academy. (ECF No. 59-1 ¶90.) The best Clancy can do is point to testimony from the mayor's chief of staff that the Mayor's Office "would have been aware" that the MPD would enforce the curfew through arrests. (ECF No. 59-1 at 9.) This misunderstands the deliberate indifference standard. Municipalities can only be held liable for failure to train employees when their conduct is known or should have been known to be deliberately indifferent to the public such that the officers' conduct was likely to be tortious. *Flores*, 997 F.3d at 731. While, in limited circumstances, one instance can sustain a failure-to-train liability, *see City of Canton*, 489 U.S. at 390, Clancy must show "a recurring, obvious risk." He has not done so. *See id.*; *Brown*, 520 U.S. at 409. Finding *Monell* liability under a failure-to-train theory without a pattern of prior constitutional violations is a high bar that Clancy has not met. *See Bohanon v. City of Indianapolis*, 46 F.4th 669, 677 (7th Cir. 2022) ("In the rare cases where we have found this standard to be met, the risks of municipal inaction have been blatantly obvious."). Nothing about the text of the City's curfew order suggests constitutional violations were likely to occur, and "[t]o hold otherwise would significantly expand *Monell* and lead us down the road to vicarious liability." *Id.* (quoting *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 307 (7th Cir. 2010)). Defendants' motion for summary judgment on the *Monell* claim is therefore granted.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiffs' motion for partial summary judgment, ECF No. 55, is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' motion for partial summary judgment, ECF No. 48, is **GRANTED in part** and **DENIED in part**. It is granted with respect to Plaintiffs' freedom of movement claim and *Monell* claim. It is denied as to all other respects.

**IT IS FURTHER ORDERED** that, by agreement of the parties, Plaintiff's claims against Officer Rosen and John Doe police officers in addition to the excessive force claim against Moews are **DISMISSED**.

Dated at Milwaukee, Wisconsin on March 24, 2023.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge